**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 6 - 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MATTATHIAS SCHWARTZ,                                   :

            Plaintiff,                    :      15-CV-7077 (ARR) (RLM)
                                 :
     -against-                                     :      <u>OPINION AND ORDER</u>
                                 :
DEPARTMENT OF DEFENSE; DEPARTMENT OF :
NAVY; NATIONAL SECURITY AGENCY;                        :
FEDERAL BUREAU OF INVESTIGATION;                       :
CENTRAL INTELLIGENCE AGENCY; and                       :
OFFICE OF THE DIRECTOR OF NATIONAL                     :
INTELLIGENCE,                                          :
                                 :
            Defendants.                  :
-----------------------------------------------------------------X

ROSS, United States District Judge:

Plaintiff, Mattathias Schwartz, brings this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Schwartz, a journalist, submitted FOIA requests to the defendant agencies seeking the release of records that describe the government's rules for monitoring, interrupting, and censoring proceedings of the military commissions at Guantanamo Bay and the means by which it implements those rules. Defendants Central Intelligence Agency (CIA) and Department of Defense (DOD) produced certain records in response to plaintiff's request, but withheld certain responsive information. Defendant Office of the Director of National Intelligence (ODNI) searched but found no responsive records. Plaintiff argues that all three agencies failed to conduct adequate searches to locate responsive records, as they are required to do under the FOIA. Further, he argues that CIA and DOD improperly withheld information that does not fall within any FOIA exemption. Plaintiff and defendants have cross-moved for summary judgment. For the reasons that follow, plaintiff's motion is denied and defendants' motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to the Military Commissions Act of 2009, "alien unprivileged enemy belligerents" may be tried by military commission at Guantanamo "for violations of the law of war and other offenses." 10 U.S.C. § 948b. "The current structure of the military commissions operating at Guantanamo Bay is the product of an extended dialogue among the President, the Congress and the Supreme Court." In re al-Nashiri, 791 F.3d 71, 73 (D.C. Cir. 2015). The public and the press may observe military commission proceedings that take place in Guantanamo from an adjacent room that is separated from the courtroom by soundproof glass. Compl., ECF No. 1 ¶ 2; Answer, ECF No. 9 ¶ 2. The public and press can see the proceedings in real time, but hear the proceedings on an audio feed that is delayed by forty seconds. Id. To prevent the disclosure of classified information, the courtroom security officer, who sits next to the presiding judge, can turn off this audio feed by pressing a button. Id. When the button is pressed, all sound from the courtroom is cut off to the room holding the press and the public, and a red warning light flashes to alert participants in the courtroom that the proceeding has been closed. Id.

According to plaintiff, before January 2013 the general public understanding was that the audio feed could be turned off only by the courtroom security officer acting under a directive of the presiding judge. Compl. ¶ 3. But on January 28, 2013, the audio feed at the Guantanamo military commission was cut off without the presiding judge's permission. See Unofficial Tr., Decl. of Hannah Bloch-Wehba Ex. A, ECF No. 22-3, at 1445-46. The presiding judge immediately commented that "the 40-second delay was initiated, not by me. I'm curious as to why" and questioned whether "some external body is turning the commission off under their own view of what things ought to be, with no reasonable explanation." Id. This incident garnered media

attention. See, e.g., Carol Rosenberg, Guantanamo Judge Says 'External Body' Was Wrong to Censor War Court, Miami Herald, Jan. 29, 2013, ECF No. 22-4.

Plaintiff, Mattathias Schwartz, is a journalist who intends to publish an article relating to the military commission trials at Guantanamo. Compl. ¶ 9. To that end, in early 2015 Schwartz submitted requests to the government agency defendants pursuant to the FOIA, 5 U.S.C. § 552, seeking records related to interruptions of Guantanamo military commission proceedings. According to Schwartz, none of the agency defendants fully produced records responsive to his request. Compl. ¶ 44. After exhausting his administrative remedies, id. ¶ 45, Schwartz filed this action in December 2015.

Before me are cross-motions for summary judgment, filed by plaintiff and by defendants ODNI, DOD, and CIA.[1] At issue in these motions, and described in more detail below, are these three agencies' responses to Schwartz's FOIA requests.[2]

### A. Schwartz's FOIA Requests

On March 9, 2015, Schwartz submitted a FOIA request to the DOD and CIA. Declaration of Mark H. Herrington ("Herrington Decl."), Defs.' Mot. for Summ. J Ex. A, ECF No. 21-2, ¶ 4; Declaration of Mary E. Wilson ("Wilson Decl."), Defs.' Mot. for Summ. J Ex. E, ECF No. 21-6, ¶ 5. Schwartz states that on the following day he submitted a FOIA request to the ODNI, Compl.

---

[1] See Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. ("Defs.' Mem"), ECF No. 21-1; Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 22-1; Defs.' Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Reply"), ECF. No. 23; Reply Mem. in Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 25.

[2] The complaint also alleges that Schwartz submitted FOIA requests to defendants Department of Navy, National Security Agency, and Federal Bureau of Investigation, Compl. ¶ 15, to which no responses were received, id. ¶¶ 21, 24, 33. However, plaintiff has apparently agreed to dismiss his claims against these agencies based on responses subsequently provided. See Defs.' Mot. for Summ. J., ECF No. 21, at 1 n.1. Thus, only defendants ODNI, DOD, and CIA remain in this case.

¶ 15, but the ODNI claims to have never received this letter and thus the ODNI construed Schwartz's appeal letter, dated April 22, 2015, as his initial request, Declaration of Jennifer L. Hudson ("Hudson Decl."), Defs.' Mot. for Summ. J Ex. C, ECF No. 21-4, ¶ 11 & n.2.

Schwartz requested the same records from all three agencies. Specifically, each of Schwartz's FOIA requests stated the following:

> This an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. I am seeking to obtain the following records:
>
> (1) Records sufficient to disclose any and all guidance that has been given to the Office of Military Commissions, presiding officers, counsel, or any other person(s) in the courtroom about what may not be said in open public sessions or included in written submissions in prosecutions before the military commissions at the Guantanamo Bay Naval Station;
>
> (2) Records sufficient to disclose the means by which any original classifying authority can monitor or interrupt the 40-second delayed audio-video transmission of military commission proceedings to prevent the public disclosure of classified information or other information of the kinds covered by Rule 506 of the Military Commission Rules of Evidence; and
>
> (3) Records sufficient to disclose the number of security officers assigned to the military commissions, including security officers detailed to the specific defense teams, together with the duties and authorities of those security officers, the total annual cost of those security officers, and any instructions or training provided to those officers.

FOIA Requests, Compl. Ex. A, ECF No. 1-8, at 2, 5, 17; see also Herrington Decl. ¶ 4; Wilson Decl. ¶ 5; Hudson Decl. ¶ 11.

### B. Agencies' Searches for Records Responsive to Plaintiff's FOIA Request

In response to plaintiff's FOIA requests, all three agencies conducted searches for responsive records.

#### i. ODNI

ODNI's Information Management Division received plaintiff's FOIA request. The Information Management Division first communicated it to an attorney in its Office of General

Counsel who is "primarily responsible for conducting liaison with the Office of Military Commissions, and who is the person within [the Office of the General Counsel] most likely to possess potentially responsive records." Hudson Decl. ¶ 14. That attorney searched electronic folders entitled "AAA Military Commissions" on the personal drive of his work computer and searched electronic folders entitled "Military Commissions" on the shared drive of his work computer. Id. He reviewed each document in these folders. Id. Second, ODNI's Information Management Division also informed its Office of Policy and Strategy of the contents of plaintiff's request. Id. ¶ 15. A search was conducted of files entitled "Guantanamo Detainees EO 13492 and EO 13567 Current" utilizing the following search terms: "40 second," "forty second," and "security officers." Id. After consulting with subject matter experts, the ODNI determined that no records located in either search were responsive to Schwartz's request and it thus produced no documents to him. Id. ¶¶ 14, 16.

*ii. DOD*

DOD's Office of the Secretary of Defense / Joint Staff received plaintiff's FOIA request. Herrington Decl. ¶ 4. That Office directed the Office of Military Commissions Convening Authority to conduct a search for responsive documents. Id. ¶ 8. According to the declaration of Mark Herrington, Associate Deputy General Counsel of the DOD, that initial search "resulted in the release of 98 pages of material." Id.

Herrington himself then "spoke with individuals within [the Office of the General Counsel], the Office of Military Commissions generally, and persons within the Convening Authority and Prosecutor's office." Id. ¶ 10. Herrington determined that these individuals were "most likely to have records responsive to plaintiff's request" as they were "intimately familiar with the commissions and this particular proceeding and had personal knowledge of documents

5

containing responsive information." Id. Herrington's discussions with them concerning "the incident in January 2013 regarding the 40 second delay," "how classified material is handled at the commissions," and "security officers" resulted in his obtaining 437 additional pages of responsive documents, which were provided to plaintiff. Id.

### iii. CIA

The CIA's Information Management Services component, in consultation with its Office of General Counsel, received plaintiff's FOIA request and forwarded it to the agency's Office of Detainee Litigation, "the likely repository" for the requested records. Wilson Decl. ¶ 9. The Office of the Detainee Litigation conducted a search for records responsive to the first prong of plaintiff's request, described by the CIA as follows: "The search . . . included paper and electronic records, and was informed by [the Office's] knowledge of specific databases and/or files that were likely to contain [responsive material]." Id. ¶ 10. This search produced four responsive records. Id. The CIA did not conduct a search within any other offices within the agency because it determined that "no other offices . . . were likely to maintain responsive records." Id. ¶ 10

With respect to the second and third prong of plaintiff's FOIA request, the CIA did not state whether it conducted a search. Instead, it took the position that the agency "can neither confirm nor deny the existence or nonexistence of" responsive records because it cannot "reveal a classified fact – whether and to what extent the CIA is involved in the administration of information security procedures." Id. ¶ 11.

### C. Responsive Records Withheld Under FOIA Exemptions

As described above, defendant agencies DOD and CIA located records responsive to plaintiff's FOIA request. Both of these agencies provided some responsive records to plaintiff, but

withheld others as falling under FOIA's exemptions. At issue in this case are three such withholdings:[3]

*i. DOD's Redaction of PowerPoint Presentation Pursuant to Exemption 7(F)*

One of the responsive documents located in DOD's initial search was a 61-page powerpoint presentation of the 2014 annual security refresher training for the Washington Headquarter Services, Office of Special Security. Herrington Decl. ¶ 9. The DOD produced this powerpoint presentation to plaintiff with redactions. Id. At issue in this case is DOD's redaction of information in the presentation regarding "threat assessments" and "physical opening and closing procedures" for the Office of Special Security, which the DOD claims falls under FOIA's exemption 7(F) based on the need to "avoid physical harm of members of the office." Id. Exemption 7(F) allows an agency to withhold responsive records or information "compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).

*ii. CIA's Redaction of Classified Information Pursuant to Exemptions 1 and 3*

Two documents produced by the CIA in response to the first prong of plaintiff's request contain redactions of classified information at issue here. See Wilson Decl. ¶ 10; Declaration of Antoinette B. Shiner ("Shiner Decl."), Defs.' Mot. for Summ. J Ex. B, ECF No. 21-3, ¶¶ 6, 14.[4]

---

[3] In response to plaintiff's motion for summary judgment, the defendant agencies voluntarily produced two of the five documents that plaintiff had claimed were improperly withheld. DOD produced to plaintiff in full a thirty-three page contract with SRA International, from which DOD had previously redacted an itemization of costs. See Def.'s Reply at 2 n.1; Pl.'s Reply at 9. The CIA produced to plaintiff a document that had previously been withheld because it was under seal. See Suppl. Decl. of Anoinette B. Shiner, ("Shiner Suppl. Decl."), Defs.' Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. Ex. F, ECF No. 24-1, ¶¶ 3-4; Defs.' Reply at 32; Pl.'s Reply at 10.

[4] Plaintiff initially challenged this type of redaction in a third document, but that document's only redaction was lifted so it is no longer at issue. Shiner Decl. ¶ 7 & n.3.

These documents are titled "Classification Guidance for CIA High Value Detainee Information" and "Classification Guidance for Central Intelligence Agency Rendition, Detention, and Interrogation Program Information." Shiner Decl. ¶ 8. The CIA explains that both documents "were developed . . . to provide classification guidance to court security officers and other personnel supporting the military commissions, who are often asked to advise others or opine on the classification of information related to the CIA's former Rendition, Detention, and Interrogation program." Id.

Plaintiff challenges five of the redactions in these documents. The CIA maintains that these redactions are proper under both FOIA exemption 1 and exemption 3. Exemption 1 permits an agency to withhold information properly classified pursuant to the terms of an executive order that specifically authorizes information to be kept secret "in the interest of national defense or foreign policy." 5 U.S.C. § 552(b)(1). The CIA's invocation of exemption 1 relies upon Executive Order 13526 § 1.4(c), which authorizes classification of certain information, including "intelligence sources or methods," that "could reasonably be expected to cause identifiable or describable damage to the national security." Exec. Order No. 12526, 75 Fed. Reg. 707 (Dec. 29, 2009); Shiner Decl. ¶ 10. Exemption 3 permits an agency to withhold information that is "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). The CIA's invocation of exemption 3 relies upon the National Security Act, 5 U.S.C. § 3024, which authorizes the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 5 U.S.C. § 3024(i)(1).

After the plaintiff filed his cross-motion for summary judgment, the CIA reprocessed his FOIA request and produced reprocessed versions of these two documents. See Letter, ECF No. 27. The reprocessed documents maintained the five redactions challenged by the plaintiff, but withdrew certain other redactions that had appeared in the initially produced version.

*iii. CIA's Glomar Response*

The CIA did not disclose to plaintiff whether it conducted a search for records responsive to the second and third prongs of his request. Instead, the CIA asserted a "<u>Glomar</u> response": a statement to plaintiff that the CIA "can neither confirm nor deny the existence or nonexistence of such records." Wilson Decl. ¶ 11; <u>see also</u> <u>Phillippi v. Cent. Intelligence Agency</u>, 546 F.2d 1009, 1013 (D.C. Cir. 1976) (case from which the term "Glomar response" derives its name).

The CIA asserts that "the 'fact of' the existence or nonexistence of records responsive to parts two and three of plaintiff's request is classified and properly withheld pursuant to FOIA Exemptions [1 and 3]." Shiner Decl. ¶ 19. Shiner explains the CIA's position:

> If the CIA were to confirm the existence of records responsive to [the second part of plaintiff's FOIA request], such confirmation could indicate, among other things, that the CIA has previously interrupted the 40-second delayed audio-video transmission of military commission proceedings. An adversary could use that information to identify areas of concern to the CIA. On the other hand, if the CIA were to respond by admitting that it did not have records responsive to part two of the request, it could suggest that the CIA does not have the ability to monitor or interrupt the audio-video transmission of proceedings, which could cause participants to disregard the rules regarding the communication of CIA-related information in open court. With respect to part three, if the CIA were to confirm the existence of responsive records, such confirmation could reveal the CIA's role, if any, in the assignment of security officers to the military commissions and its relationship to the Office of Military Commissions. In short, a CIA response that confirms or denies the existence or nonexistence of records would reveal sensitive information about the CIA's activities, sources, and methods that is protected from disclosure.

<u>Id.</u> ¶ 24.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the nonmovant's favor." <u>Delaney</u>

v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quoting Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir.2008)). Conversely, "[w]hen no rational jury could find in favor of the nonmoving party . . . , there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). "[T]he vast majority of FOIA cases can be resolved on summary judgment." Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011).

## DISCUSSION

The Freedom of Information Act (FOIA), 5 U.S.C. § 552, "was enacted to promote honest and open government" by requiring federal agencies to make records available to the public upon request. Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999). The FOIA reflects "a general philosophy of full agency disclosure." Dep't of Air Force v. Rose, 425 U.S. 352, 360 (1976). Upon receiving a FOIA request, an agency must conduct a search that is "reasonably calculated to discover the requested documents." Grand Cent. P'ship, 166 F.3d at 489 (quoting SafeCard Servs., Inc. v. S.E.C., 926 F.2d 1197, 1201 (D.C. Cir. 1991)). It must then provide all responsive records to the requestor, except any portion that falls within one of nine specific statutory exemptions. See 5 U.S.C. 552(b). "[A] FOIA requester may challenge the adequacy of the agency's search for responsive records, the adequacy of the agency's application of FOIA exemptions to his or her request, or both." Bigwood v. U.S. Dep't of Def., 132 F. Supp. 3d 124, 135 (D.D.C. 2015).

## I. Adequacy of Defendants' Searches to Locate Records Responsive to Plaintiff's Request

Defendants argue that they are entitled to summary judgment because each agency has demonstrated that it conducted an adequate search to locate records responsive to plaintiff's FOIA

request. Defs.' Mem. at 6-13. Plaintiff disagrees, and argues that none of the agencies has conducted an adequate search. Pl.'s Mem. at 7-16.

The FOIA requires an agency's search to be adequate in "scope and method." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982) (per curiam). As to the scope of the agency's search, the FOIA requires the agency to search all locations likely to contain responsive documents. See DiBacco v. U.S. Army, 795 F.3d 178, 190 (D.C. Cir. 2015). This does not mean that an agency is required to search "every record system" in response to each and every FOIA request. Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). But the agency cannot limit itself to searching only a single location that is most likely to contain responsive documents so long as there are other locations likely to turn up the requested information. Id.; see DiBacco, 705 F.3d at 190.

As to the search method, "adequacy — not perfection — is the standard that FOIA sets." DiBacco, 705 F.3d at 191. "[T]he agency must show that it . . . us[ed] methods which can be reasonably expected to produce the information requested." Oglesby, 920 F.2d at 68; accord Grand Cent. P'ship, 166 F.3d at 489. In other words, "[t]he court applies a 'reasonableness' test to determine the 'adequacy' of a search methodology." Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 27 (D.C. Cir. 1998) (quoting Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). To do so, courts take into account: "the search terms and the type of search performed," Oglesby, 920 F.2d at 68; the nature of the records system or database searched, see Perry, 684 F.2d at 127; Amnesty Int'l USA v. C.I.A., No. 07 Civ. 5435, 2008 WL 2519908, at *11 (S.D.N.Y. June 19, 2008); and whether the search was "logically organized," DiBacco, 795 F.3d at 191.

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). Summary judgment may be granted for the agency on the basis of a "relatively detailed and nonconclusory" declaration. Grand Cent. P'ship, 166 F.3d at 488–89 (quoting SafeCard Servs., 926 F.2d at 1200). This declaration must "supply[] facts indicating that the agency has conducted a thorough search." Carney, 19 F.3d at 812. An agency declaration must contain — at a minimum — two elements. First, to show that the search was of the proper scope, the declaration must state "that all files likely to contain responsive materials . . . were searched." Oglesby, 920 F.2d at 68. Second, the declaration must contain a description of the "the search terms and the type of search performed" so that a court can assess the reasonableness of the search method. Id.; see also Schrecker v. U.S. Dep't of Justice, 217 F. Supp. 2d 29, 33 (D.D.C. 2002), aff'd, 349 F.3d 657 (D.C. Cir. 2003) (An agency's declaration "must provide basic information on what records were searched, by whom, and in what manner").[5]

An agency's declaration that presents a prima facie showing that the search was adequate will generally suffice for summary judgment. See Carney, 19 F.3d at 812. This showing may be overcome by a plaintiff in two ways — by "showing . . . bad faith on the part of the agency" or "provid[ing] some tangible evidence that . . . summary judgment is otherwise inappropriate," id. — but neither is at issue here.[6] Thus, as the parties recognize, summary judgment will be granted

---

[5] District courts in this circuit follow the standard set out by the D.C. Circuit in Oglesby. See, e.g., N.Y. Times Co. v. United States Dep't of the Treasury, No. 15-cv-5740, 2016 WL 4147223, at *4 (S.D.N.Y. Aug. 2, 2016); Vietnam Veterans of Am. Conn. Greater Hartford Chapter 120 v. Dep't of Homeland Sec., 8 F. Supp. 3d 188, 206 (D. Conn. 2014); N.Y. Times Co. v. U.S. Dep't of Justice, 915 F. Supp. 2d 508, 533 (S.D.N.Y. 2013), aff'd in relevant part, rev'd in part, 756 F.3d 100 (2d Cir. 2014); Schwarz v. Dep't of Justice, No. 10 Civ. 0562, 2010 WL 2836322, at *4 (E.D.N.Y. July 14, 2010), aff'd, 417 F. App'x 102 (2d Cir. 2011).

[6] First, plaintiff explicitly disclaims any argument that any of the defendant agencies acted in bad faith. See Pl.'s Reply at 8 n.1. Second, plaintiff initially argued that one specific responsive document was not produced by the CIA, which could support an inference that the CIA's search was inadequate. See Pl.'s

in defendants' favor if their declarations establish a prima facie showing of an adequate search but will be denied if the declarations "leave[] substantial doubt as to the sufficiency of the search." Campbell, 164 F.3d at 27 (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)); see also Def.'s Mem. at 9, 12, 13 (arguing that each agency has "satisfied its burden to demonstrate the adequacy of its search as a matter of law"); Pl.'s Mem. at 7 (arguing that "[f]ar from meeting their statutory burden, each of the declarations submitted by these defendants is facially inadequate"). As I explain below, all three agencies have supported their motions for summary judgment with declarations that fall short of FOIA's requirements, so summary judgment cannot be granted in defendants' favor.

## A. ODNI's Search for Responsive Records

In support of its motion for summary judgment, the ODNI submitted the declaration of Jennifer L. Hudson, the director of the agency's Information Management Division. Hudson Decl. ¶ 1. Hudson's declaration explains that the ODNI conducted two searches in response to plaintiff's FOIA request: the first by an attorney in the Office of the General Counsel, who searched computer folders entitled "AAA Military Commissions" and "Military Commissions," and the second by an unnamed person or persons within the Office of Policy and Strategy, who searched files entitled "Guantanamo Detainees EO 13492 and EO 13567 Current" utilizing the search terms "40 second," "forty second," and "security officers." Id. ¶ 14-15. Hudson's declaration satisfies neither element required by the FOIA: it does not state that all files likely to contain responsive records were searched, nor does it describe ODNI's search methodology. Accordingly, Hudson's declaration

---

Mem. at 15; Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 327 (D.C. Cir. 1999) (specific evidence of documents not produced can create a factual dispute as to adequacy of the search). The CIA explained, however, that this document was in fact produced by its search but withheld because it was under seal. Defs.' Reply at 13 n.4; Shiner Suppl. Decl. ¶ 3. Under this circumstance, that this document was not produced by the CIA in the first instance does not support an inference that the CIA's search was inadequate.

fails to demonstrate that the ODNI conducted an adequate search in response to Schwartz's request and cannot support ODNI's motion for summary judgment.

An agency must search all offices likely to have responsive records; it does not suffice for an agency to search only the locations "most likely" for responsive documents to be located. See DiBacco, 795 F.3d at 190 ("'[M]ost likely' is not the relevant metric"); Mobley v. C.I.A., 806 F.3d 568, 582 (D.C. Cir. 2015) ("Had the [agency] only searched the record systems 'most likely' to contain responsive records, its search would be inadequate."). Amnesty Int'l, 2008 WL 2519908, at *9 ("[A]n agency 'cannot limit its search to only one [office] if there are others that are likely to turn up the information requested.'" (alteration in original) (quoting Oglesby, 920 F.2d at 68)); Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency, 877 F. Supp. 2d 87, 98 (S.D.N.Y. 2012) ("[T]he government is not required to search only the files of the two custodians who are 'most likely' to have responsive records; it must also search other locations that are reasonably likely to contain records.").

Hudson twice states that a search was conducted within the two ODNI components "most likely" to possess records, Hudson Decl. ¶¶ 13, 16, but nowhere states that the two components searched are the only components likely to have responsive documents. Similarly, Hudson explains that within each component, a person or persons who were "most likely" or simply "likely" to have the records conducted a search, Hudson Decl. ¶¶ 14, 16, but nowhere states that all record systems within these components likely to have responsive documents were searched. Hudson's declaration is thus facially inadequate, because it does not state that all locations likely to have responsive records were searched. See Oglesby, 920 F.2d at 68 ("At the very least, [the agency is] required to explain in its affidavit that no other record system was likely to produce

14

responsive documents."); Nat'l Day Laborer, 877 F. Supp. 2d at 96 (An agency "must establish that [it] searched all custodians who were reasonably likely to possess responsive documents.").

This deficiency cannot be cured by Hudson's conclusory final statement that "[a]ll files reasonably expected to contain the requested records were, in fact searched." Hudson Decl. ¶ 16. Nor am I persuaded by ODNI's argument that its search of all components with responsive records is "implicit" in Hudson's declaration. Defs.' Reply at 5 n.2. Plaintiff plausibly suggests that the National Counterintelligence and Security Center, another office within the ODNI, may hold responsive records. Pl.'s Mem. at 10 & n.1. Without a specific assertion in Hudson's declaration that all offices and file systems reasonably likely to contain responsive documents were searched, there is no basis to conclude that this requirement has been met. Valencia-Lucena, 180 F.3d at 327 (finding search inadequate where the "offices searched according to the [agency's] declaration were not the only places 'likely to turn up the information requested.'" (quoting Oglesby, 920 F.2d at 68)); Nat'l Immigration Project of the Nat. Lawyers Guild v. U.S. Dep't of Homeland Sec., No. 11 Civ. 3235, 2012 WL 6809301, at *4 (S.D.N.Y. Dec. 27, 2012) (finding search inadequate when agency could have "reasonably foreseen that a search of [other agency offices] would reveal . . . information that the plaintiffs had requested.").

Hudson's declaration is inadequate for a second, independent reason: she fails to adequately describe the method used by the ODNI to conduct either search. As to the first search, Hudson explains that the attorney who conducted it looked through his own computer file entitled "AAA Military Commissions" and a shared folder entitled "Military Commissions." Hudson Decl. ¶ 14. But Hudson fails to "identif[y] with reasonable specificity the system of records" maintained by the Office of General Counsel. See Perry, 684 F.2d at 127. Absent any understanding of the file system utilized by the Office and the relationship of the two searched files to this file system, there

is no basis to find that ODNI's search of the Office of General Counsel was reasonably likely to produce records responsive to plaintiff's request. See Nat'l Immigration Project, 2012 WL 6809301, at *8 (explaining that "[n]either the Court nor the plaintiffs can assess the reasonableness of [the] search" when the agency's declaration "describes only the internal offices . . . searched, identifying neither the databases that it searched nor the terms that it used"). Instead, the court is left with questions about the relationship between the files searched and the rest of the Office of General Counsel's file system that bear on the adequacy of the search, for example: whether the two folders searched hold all or even any of the Office's records relating to military commissions at Guantanamo; whether they contain copies of emails or other communications to and from Office staff that may be responsive to plaintiff's request; and whether the Office maintains a central database or other filing system separate from these folders where responsive documents were reasonably likely to be found.

The details of the ODNI's second search, conducted at the Office of Policy and Strategy, are even more opaque. It was conducted by some unnamed individual or individuals, who searched files described only by their titles: "Guantanamo Detainees EO 13492 and EO 13567 Current." What these file names stand for, what documents they were created to hold, and whether they are the only locations likely to hold documents responsive to plaintiff's request, are questions left unanswered by Hudson. Further, the ODNI used only the search terms "40 second," "forty second," and "security officers" in the second search. This search was unreasonably narrow given the breadth of plaintiff's request. Amnesty Int'l, 2008 WL 2519908, at *15 ("[A] search that is designed to return documents containing the phrase 'CIA detainees' but not 'CIA detainee' or 'detainee of the CIA' is not 'reasonably calculated to uncover all relevant documents.'" (emphasis omitted) (quoting Truitt, 897 F.2d at 542)). Though an "an agency is not required to search for all

possible variants of a particular name or term," Conti v. U.S. Dep't of Homeland Sec., No. 12 Civ. 5827, 2014 WL 1274517, at *15 (S.D.N.Y. Mar. 24, 2014), it must use search terms reasonably calculated to yield responsive records. The ODNI has not demonstrated how using only these three search terms in only these two files is reasonably likely to yield responsive records. See Pl.'s Mem. at 11; Garcia v. U.S. Dep't of Justice, Office of Info. & Privacy, 181 F. Supp. 2d 356, 368 (S.D.N.Y. 2002) ("In order to fulfill the adequate search requirement, the Government should 'identify the searched files' and 'recite facts which enable the District Court to satisfy itself that all appropriate files have been searched.'" (quoting Church of Scientology v. I.R.S., 792 F.2d 146, 151 (D.C. Cir. 1986), aff'd, 484 U.S. 9 (1987))).

## B. DOD's Search for Responsive Records

In support of its motion for summary judgment, the DOD submitted the declaration of Mark H. Herrington, Associate Deputy General Counsel of the DOD. Herrington Decl. ¶ 1. Herrington's declaration describes two searches conducted by the DOD in response to plaintiff's request. First, Herrington states that DOD's Office of Military Commissions Convening Authority conducted a search for responsive records, id. ¶ 8, though he does not explain who within the Office conducted the search, what records were searched, or why those files were designated for search. Second, Herrington himself spoke to individuals within various "offices determined most likely to have records responsive to Plaintiff's request," id. ¶ 10, and some or all of these unnamed individuals produced responsive records.

Herrington's declaration is patently insufficient to support DOD's motion for summary judgment. First, Herrington's declaration contains no statement indicating "that all files likely to contain responsive materials . . . were searched," Oglesby, 920 F.2d at 68. Herrington states that the Office of Military Commissions Convening Authority conducted a search because plaintiff's

request falls "within the purview of" that Office, Herrington Decl. ¶ 6, and that the individuals he personally spoke to were within the offices "most likely to have documents." It bears repeating that searching the offices "most likely" to house responsive documents is not sufficient; an agency is required to search all locations in which responsive documents are likely to be found.

Herrington's declaration also fails because it provides no explanation of DOD's search methodology, let alone a description of "what records were searched, by whom, and in what manner," as the FOIA requires. Schrecker, 217 F. Supp. 2d at 33. Absolutely no details are provided about the method of the first search. Herrington's declaration suggests that some unnamed person or persons in DOD's Office of Military Commissions Convening Authority conducted a search of some unidentified files using some unidentified method. The only detail provided about the first search is that it "resulted in the release of 98 pages of material." Herrington Decl. ¶ 8. But "the adequacy of a FOIA search is . . . determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search" — and Herrington has not described the methods with sufficient specificity. See Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003).

DOD's second search was conducted in part personally by Herrington, who had conversations with certain unnamed individuals who "were intimately familiar with the commissions . . . and had personal knowledge of documents containing responsive information." Herrington Decl. ¶ 10. This search resulted in 437 pages of documents being produced to the plaintiff, id.; but again, the result of the search is irrelevant to determine whether it was adequately conducted. Herrington's declaration describes the second search so generally that the court can only infer that certain unnamed individuals in various offices may have conducted some unidentified searches of some unidentified files using some unidentified method.

Clearly, the dearth of facts in Herrington's declaration renders it inadequate to support the DOD's motion for summary judgment. See Perry, 684 F.2d at 126 ("FOIA does not . . . require courts to accept glib government assertions."); Davis v. U.S. Dep't of Homeland Sec., No. 11-cv-203, 2013 WL 3288418, at *8 (E.D.N.Y. June 27, 2013) ("The declaration does not explain . . . what, if any, databases they searched [or] what actions were taken to determine whether responsive records existed. . . . [T]he declaration does not provide sufficient detail and is conclusory. Accordingly, the court finds that the . . . declaration does not support a finding that the [agency] conducted an adequate search.").

## C. CIA's Search for Responsive Records

In support of its motion for summary judgment, the CIA submitted the declaration of Mary E. Wilson, the Acting Information Review Officer for the Litigation Information Review Office at the CIA. Wilson Decl. ¶ 1. Wilson's declaration describes the search conducted by the CIA's Office of Detainee Litigation for documents responsive to the first prong of plaintiff's FOIA request.

Unlike ODNI and DOD, the CIA has submitted a declaration that "aver[s] that all files likely to contain responsive materials . . . were searched." Oglesby, 920 F.2d at 68. Wilson explains that the CIA "ascertain[ed] all locations reasonably likely to possess records responsive to the first part of [plaintiff's] request." Wilson Decl. ¶ 9. The Office of Detainee Litigation was identified as the "most likely repository" for the requested records, id., and CIA officials "did not task or search any other offices within the CIA because it was determined that there were no other offices that were likely to maintain responsive records, id. ¶ 10 (emphasis added). The CIA has thus met its burden to show that the scope of the search was proper. See Adamowicz v. I.R.S., 402 F. App'x 648, 651 (2d Cir. 2010) (adequate to search the office that the agency's declarant "identified as the

19

only location where responsive documents might be found."); <u>DiBacco</u>, 795 F.3d at 190 (adequate to search the office where it was "most likely" records would be found when agency declarant stated he was "unaware of any other locations" with responsive records).

Wilson's declaration, however, fails to describe the CIA's methodology in a manner that would allow summary judgment to be granted in the CIA's favor. Wilson states in conclusory fashion that employees in the Office of Detainee Litigation conducted "a thorough and diligent search" that "included paper and electronic records, and was informed by [the Office's] knowledge of specific databases and/or files that were likely to contain" responsive material. Wilson Decl. ¶ 10. This description does not contain "the search terms and the type of search performed," <u>Oglesby</u>, 920 F.2d at 68, and does not explain "what records were searched, by whom, and in what manner," <u>Schrecker</u>, 217 F. Supp. 2d at 33, required in order for the court to assess the search's reasonableness. Wilson's conclusory statements are thus insufficient to support the CIA's motion for summary judgment as to the adequacy of its search.

## D. Summary Judgment is Denied as to the Adequacy of Defendants' Searches

As described above, each of the three defendant agencies has failed to submit a declaration that describes an adequate search for responsive records as required by the FOIA. Accordingly, each defendant agency has failed to meet its burden for summary judgment. Their motions for summary judgment are denied without prejudice to renewal.

To the extent plaintiff seeks summary judgment that defendants' searches were inadequate, <u>see</u> Pl.'s Reply at 2, this motion is likewise denied. While defendants have failed to describe their searches at a level of specificity that would allow this court to determine their adequacy, the record does not show that the searches were inadequate as a matter of law.

## II. Withholding of Responsive Records Under FOIA's Exemptions

An agency may withhold records responsive to a FOIA request to the extent that the withheld information falls within one of FOIA's nine statutory exemptions. 5 U.S.C. § 552(b). FOIA's exemptions are exclusive, and they are narrowly construed. Am. Civil Liberties Union v. Dep't of Def. ("ACLU v. DOD I"), 543 F.3d 59, 66 (2d Cir. 2008), vacated on other grounds, 558 U.S. 1042 (2009). "[A] district court must review de novo an agency's determination to withhold information requested under the FOIA." Florez v. C.I.A., 829 F.3d 178, 182 (2d Cir. 2016) (citing 5 U.S.C. § 552(a)(4)(B)). The burden of persuasion rests on the agency; "[d]oubts, therefore, are to be resolved in favor of disclosure." ACLU v. DOD I, 543 F.3d at 66.

"Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith. Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 73 (2d Cir. 2009) (quoting Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)).

### A. DOD's Redaction of PowerPoint Slides Pursuant to Exemption 7(F)

The DOD produced to plaintiff a powerpoint presentation from the 2014 annual security refresher training for Office of Special Security's Washington D.C. headquarters. Herrington Decl. ¶ 9. The Office of Special Security is responsible for maintaining physical security for the Office of Military Commissions. Id. The presentation was a briefing for employees in the Office of Special Security to remind them "of security procedures and the need for operational security awareness." Id. ¶ 16.

The DOD redacted from the copy of the presentation produced to plaintiff information "regarding threat assessments and physical opening and closing procedures for the Office of Special Security." Id. ¶9. The DOD claims that this redaction is permissible under FOIA's exemption 7(F) because disclosure could lead to "physical harm of members of the office." Id. Mark Herrington, Associate Deputy General Counsel of the DOD, states that:

> This release of this information . . . could jeopardize the safety of the individuals in that office by allowing persons with nefarious intent valuable information that could compromise the personnel's physical security. For example, releasing the exact procedures for gaining entry into the physical space of the office would aid a potential assailant to know whether they require a key card, a retinal scan, a combination code, a finger print scan, voice recognition, etc. The withholding of such information keeps the physical space secure and, in turn, protects from compromising the physical safety of the personnel in the Office of Special Security.

Id. ¶ 16.

Exemption 7(F) permits an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). As I explain below, DOD's powerpoint presentation is not a "record[] or information compiled for law enforcement purposes," so exemption 7(F) does not apply.

As a threshold matter, an agency invoking exemption 7 bears the burden of demonstrating that the records or information withheld were "compiled for law enforcement purposes." Id.; John Doe Agency v. John Doe Corp., 493 U.S. 146, 153 (1989). The term "compiled" in exemption 7 is broad; it requires only "that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption." Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico, 740 F.3d 195, 203 (D.C. Cir. 2014). "This definition . . . readily . . . cover[s] documents already collected

by the Government originally for non-law-enforcement purposes" that are subsequently used for law enforcement purposes. John Doe Agency, 493 U.S. at 153.

In considering an agency's withholding under exemption 7, the key question is "whether the files sought relate to anything that can fairly be characterized as [a law] enforcement proceeding." Jefferson v. Dep't of Justice, Office of Prof'l Responsibility, 284 F.3d 172, 177 (D.C. Cir. 2002) (quoting Aspin v. Dep't of Def., 491 F.2d 24, 27 (D.C. Cir. 1973)). "The term 'law enforcement' in Exemption 7 refers to the act of enforcing the law, both civil and criminal." Pub. Emps., 740 F.3d at 203. It "entails more than just investigating and prosecuting individuals after a violation of the law. . . . 'includ[ing] proactive steps designed to prevent criminal activity and to maintain security.'" Id. (alteration omitted) (quoting Milner v. Dep't of Navy, 562 U.S. 562, 582 (2011) (Alito, J., concurring)).

When an agency has both law enforcement and non-law enforcement functions, a court must carefully review the agency's claim that withheld documents were compiled for a law enforcement purpose:

> [T]hat a mixed-function agency is acting within the scope of its authority tells a court nothing about whether it has met the Exemption 7 threshold requirement of a "law enforcement purpose." Law enforcement, indeed, is often one of such an agency's proper functions, but other functions are also a major part of the agency's day-to-day business. Thus, a court must scrutinize with some skepticism the particular purpose claimed for disputed documents redacted under FOIA Exemption 7. If courts accept a mixed-function agency's claims of "law enforcement purpose" without thoughtful consideration, the excessive withholding of agency records which Congress denounced . . . might well result.

Pratt v. Webster, 673 F.2d 408, 418 (D.C. Cir. 1982); see also Pub. Emps., 740 F.3d at 203; Tax Analysts v. I.R.S., 294 F.3d 71, 77 (D.C. Cir. 2002) (describing "exacting standard" for reviewing such claims).

The DOD has failed to demonstrate that the redacted information "relate[s] to anything that can fairly be characterized as [a law] enforcement proceeding." See Jefferson, 284 F.3d at 177.

DOD asserts, and plaintiff does not appear to dispute, that it engages in law enforcement at the military commissions at Guantanamo Bay. See Defs.' Reply at 15. The redacted portion of the powerpoint, however, includes information only about "threat assessments and physical opening and closing procedures for the Office of Special Security['s]" headquarters in Washington DC. Herrington Decl. ¶ 9. DOD does not assert that any of the redacted information relates to the military commissions, any other DOD operations at Guantanamo Bay, or any identifiable undertaking by the DOD to prevent risks to national security.

The DOD argues that the presentation was prepared for law enforcement purposes because the Office of Special Security's responsibilities include maintaining physical security at Guantanamo. Defs.' Reply at 15. In effect, DOD is arguing that the presentation was prepared for a law enforcement purpose because it was created to maintain the physical security of an office that is in turn charged with maintaining physical security at Guantanamo. Defs.' Mot. at 15. But this link is too attenuated. When exemption 7 has been applied beyond its usual context of law enforcement investigatory files, see Families for Freedom v. U.S. Customs & Border Prot., 797 F. Supp. 2d 375, 397 (S.D.N.Y. 2011), defendant agencies have provided a clear and direct link between the record withheld and a specific law enforcement purpose for which it was prepared. See, e.g., Tax Analysts, 294 F.3d at 79; Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 777 F.3d 518, 523 (D.C. Cir. 2015) (finding Department of Homeland Security's protocol for shutting down wireless networks in case of emergencies was compiled for a law enforcement purpose and explaining that the document "was developed[ after the 2005 bombings of London's transportation system to address deficiencies in the United States' ability to address and respond to [emergency threats]"); Pub. Emps., 740 F.3d at 204 (finding emergency action plans were

created for a law enforcement purpose because "they describe the security precautions that law enforcement personnel should implement . . . during emergency conditions").

No such direct link between the withheld information and any law enforcement purpose has been provided by the DOD. According to the DOD, the presentation was created as part of the 2014 annual security refresher for the Washington DC headquarters of the Office of Special Security. As plaintiff points out, the powerpoint presentation was essentially about "office building security measures for [a federal agency's] civilian employees." Pl.'s Mem. at 20. The DOD has provided no explanation of how "information about the physical security of the Washington Headquarters Service, which is located in Washington D.C.[,] . . . was compiled for, or even related to, any security requirements of the military commissions located in Guantanamo Bay. . . [or] that the briefing's purpose was related to the military commissions in any respect." Pl.s' Reply at 11. Nor does DOD suggest that, after being initially drafted for a security refresher at Office of Special Security's Washington headquarters, the presentation was subsequently "given to law enforcement officers for security purposes," which could render the presentation subject to exemption 7(F). See Milner, 562 U.S. at 584.

The DOD also attempts to invoke exemption 7 by simply declaring that the "definition of law enforcement purposes is broad and includes national security information." Herrington Decl. ¶ 16. This argument is similarly unpersuasive. As described above, the DOD identifies no specific link between the information redacted from the presentation and the agency's law enforcement function — even if that law enforcement function is defined broadly to include its national security work. The redacted material in the presentation consists only of information relating to the physical security procedures for a domestic government building. The DOD has in no way suggested that the information redacted has any specific link to national security. Further, the Second Circuit has

been clear that Exemption 7(F) cannot be used by agencies as an end-run around established procedures for classification of material that poses a risk to national security and so courts should closely scrutinize an agency's claim that non-classified national security information was compiled for law enforcement purposes. ACLU v. DOD I, 543 F.3d at 73 ("It would be anomalous if an agency that could not meet the requirements for classification of national security material could, by characterizing the material as having been compiled for law enforcement purposes, evade the strictures and safeguards of classification and find shelter in exemption 7(F) simply by asserting that disclosure could reasonably be expected to endanger [the life or physical safety of any individual.]").

Accordingly, DOD's motion for summary judgment is denied as to the propriety of its redaction of the powerpoint presentation under exemption 7(F). I deny this motion without prejudice to renewal.[7]

## B. CIA's Redaction of Classified Information Pursuant to Exemptions 1 and 3

Plaintiff challenges five redactions of classified information in two responsive documents produced by the CIA, identified by the CIA as C06579389 and C06579390 (referred to herein as Document 89 and Document 90, respectively). See Redacted Copies, Decl. of Hannah Bloch-Wehba Ex. G, ECF No. 22-9, at 4-7 (Doc. 89), 8-13 (Doc. 90); see also Shiner Decl. ¶¶ 6, 7 & n.3; Pl.'s Reply at 10. Document 89 is an undated four-page document titled "Classification Guidance for CIA High Value Detainee Information." Shiner Decl. ¶ 8. Document 90 is a six-page document

---

[7] Because the DOD has failed to meet the threshold requirement applicable to all Section 7 exemptions — that is, that the withheld information was "compiled for law enforcement purposes" — there is no reason to address the more specific requirement needed to satisfy exemption 7(F) — that disclosure "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). As noted, however, DOD's defense of this redaction is rejected without prejudice to renewal under any alternative FOIA exemption that may apply. Accordingly, plaintiff's motion for summary judgment rejecting this redaction is likewise denied.

dated September 23, 2011 titled "Classification Guidance for Central Intelligence Agency Rendition, Detention, and Interrogation Program Information." Id.

The CIA explains that both documents "were developed . . . to provide classification guidance to court security officers and other personnel supporting the military commissions, who are often asked to advise others or opine on the classification of information related to the CIA's former Rendition, Detention, and Interrogation program ('RDI Program')." Id. Each document contains, as relevant here, two lists: "Information Relating to the RDI Program that Remains Classified" and "Other Classified Information Not Relating to the RDI Program." See Doc. 89 at 3-4; Doc. 90 at 5-6, ECF No. 22-9 at 6-7, 12-13. Each list contains bullet points of categories of classified information: some bullet points are redacted in full, some are redacted in part, and others are not redacted at all. For example, some of the non-redacted bullet points include: "The names of or identifying information regarding any [high value detainee] . . . against whom [enhanced interrogation techniques] were applied"; "Names of or identifying information about any detainees held in CIA custody, other than the 16 [high value detainees] publicly identified by President Bush"; and "Information regarding questions asked to detainees in CIA debriefing or interrogation sessions and the answers that detainee provided." Doc. 90 at 5-6, ECF No. 22-9 at 12-13.

Plaintiff challenges five redactions on these lists.[8] The CIA maintains that these redactions are proper under FOIA exemptions 1 and 3.

*i. Statutory Framework*

Exemption 1 allows an agency to withhold information classified pursuant to an executive order; Exemption 3 allows an agency to withhold information specifically authorized to be

---

[8] Plaintiff challenges one redaction on the fourth page of Document 89 and four redactions on the sixth page of Document 90, specifically identified in CIA Redactions Challenged by Plaintiff, Defs.' Mot. for Summ. J Ex. D, ECF No. 21-5, at 3.

withheld by a federal statute. 5 U.S.C. § 552(b). As explained in more detail below, in this case the applicability of these exemptions hinges on one key question: whether the CIA has met its burden to demonstrate that the redacted information is comprised of "intelligence sources and methods."

FOIA's exemption 1 is "a specific exemption for defense and foreign policy secrets [that] delegates to the President the power to establish [its] scope . . . by executive order." Military Audit Project v. Casey, 656 F.2d 724, 737 (D.C. Cir. 1981). It permits an agency to withhold information that is properly classified pursuant to an executive order. 5 U.S.C. § 552(b)(1). The CIA argues that the withheld information was properly classified pursuant to Executive Order 13526, which authorizes classification of information that meets four requirements: (1) "an original classification authority is classifying the information;" (2) "the information is owned by, produced by or for, or is under the control of the United States Government;" (3) the information falls within one of the categories of information specified in the order; and (4) "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage." Exec. Order No. 13526 § 1.1, 75 Fed. Reg. 707 (Dec. 29, 2009). The CIA asserts that the withheld information relates to "intelligence sources or methods" and "intelligence activities," two of the categories of information subject to classification as specified by the order. Id. § 1.4.

FOIA's exemption 3 permits an agency to withhold information that is specifically exempted from disclosure by statute. 5 U.S.C. § 552(b)(3). The CIA asserts that its withholdings are authorized by the National Security Act, 50 U.S.C. § 3024, which instructs the Director of National Intelligence to protect certain information from disclosure including, as relevant here,

"intelligence sources and methods." 50 U.S.C. § 3024(i)(1). There is no dispute that exemption 3 applies to information properly withheld pursuant to the National Security Act. See Wilner, 592 F.3d at 72; see also C.I.A. v. Sims, 471 U.S. 159, 167 (1985).

Accordingly, to determine whether exemption 1 or exemption 3 applies, a threshold question is whether the withheld information relates to "intelligence sources and methods." If so, exemption 3 applies and there is no need to consider whether the additional requirements of exemption 1 are met. See, e g., Wilner, 592 F.3d at 72 ("Because defendants need only proffer one legitimate basis . . . and FOIA Exemptions 1 and 3 are separate and independent grounds . . ., we consider only the applicability of FOIA Exemption 3.").

The agency bears the burden of demonstrating that a FOIA exemption applies — but this burden is a "light one" in the national security context. Am. Civil Liberties Union v. U.S. Dep't of Def. ("ACLU v. DOD II"), 628 F.3d 612, 624 (D.C. Cir. 2011); see also Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003) ("We have consistently reiterated the principle of deference to the executive in the FOIA context when national security concerns are implicated."). To meet its burden here, the CIA must submit a declaration that demonstrates that "as a whole it appears logical and plausible" that the redacted information comprises "intelligence sources and methods." Gardels v. C. I. A., 689 F.2d 1100, 1105 (D.C. Cir. 1982) (internal quotations omitted); accord N.Y. Times Co. v. U.S. Dep't of Justice, 756 F.3d 100, 119 (2d Cir. 2014). The CIA's classification decision is entitled to "substantial weight." Doherty v. United States Dep't of Justice, 775 F.2d 49, 52 (2d Cir. 1985). However, "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden." Larson, 565 F.3d at 864. Once the CIA meets its burden, summary judgment will be granted in its favor unless the plaintiff can show that the CIA's declaration is

"controverted by either contrary evidence in the record [or] by evidence of agency bad faith." Wilner, 592 F.3d at 73.

> ## ii. Sufficiency of the CIA's Declaration that the Redacted Information Comprises "Intelligence Sources and Methods"

The CIA must demonstrate that it is logical and plausible that the redacted information comprises "intelligence sources and methods." In C.I.A. v. Sims, the Supreme Court considered the meaning of the term "intelligence sources and methods" as it appeared in a prior version of the National Security Act. See 471 U.S. at 167-79. The Court found that this phrase has a "broad sweep" and explained that it includes even "superficially innocuous information[,] on the ground that it might enable an observer to discover the identity of an intelligence source" by "piecing together bits of other information even when the individual piece is not of obvious importance in itself." Id. at 168, 178 (quoting Halperin v. C.I.A., 629 F.2d 144, 150 (D.C. Cir. 1980)). The Court concluded that the statutory language "simply and pointedly protect[s] all sources of intelligence that provide, or are engaged to provide, information the [government] needs to perform its statutory duties with respect to foreign intelligence." Id. at 169-70. The Second Circuit has explained that given the breadth of the term "intelligence sources and methods" as interpreted by the Supreme Court, an agency will meet its burden if its declaration shows that it is "logical and plausible" that the redacted information is needed to "protect[] our intelligence sources and methods from foreign discovery." Gardels, 689 F.2d at 1105; accord N.Y. Times, 756 F.3d at 119.

The CIA has submitted a declaration by Antoinette Shiner, the Information Review Officer for the Litigation Information Review Office at the CIA. See Shiner Decl. ¶ 1. Shiner holds original classification authority at the Top Secret level and is responsible for classification review of CIA documents involved in FOIA litigation. Id. ¶ 3. In relevant part, Shiner's declaration states that the withheld information relates to "intelligence sources and methods":

The CIA withheld information because it determined that certain discrete information within the responsive records implicated properly classified intelligence sources [and] methods. . . . Specifically, the redacted CIA information primarily relates to aspects of the CIA's Rendition, Detention, and Interrogation ("RDI") program that remain classified after the public release of the Executive Summary of the Senate Select Committee on Intelligence's Study of the Central Intelligence Agency's Detention and Interrogation Program (the "SSCI Report"). While I am limited in my ability to describe, on the public record, the intelligence . . . sources, and methods at issue and the harm that would be occasioned by their disclosure, I can acknowledge that the withheld information includes: (1) intelligence . . . sources[] and methods relevant to the capture, transfer, and interrogation of detainees. . . . [I]f the CIA disclosed particular . . . sources[] or methods, they would become less effective and their continued use by the CIA would be jeopardized.

Id. ¶¶ 14-15; see also id. ¶ 18 ("refer[ring] the Court to [the text] above for a description of the intelligence sources and methods implicated by the responsive records").

The CIA argues that "[b]ased on the Shiner declaration, it is logical and plausible that the redacted information relates to undisclosed intelligence . . . sources[] or methods." Defs.' Reply at 22. Plaintiff disagrees, arguing that the explanation provided in Shiner's declaration is conclusory and does not meet the agency's burden. Pl.'s Mem. at 30-31. As explained in more detail below, I agree with the CIA with respect to four of the five redactions: Shiner's declaration, though brief, provides sufficient information for the court to determine that it is logical and plausible that these four redactions relate to intelligence sources or methods.

Preliminarily, Shiner's declaration provides a "contextual description . . . of the documents subject to redaction." See Halpern v. F.B.I., 181 F.3d 279, 293 (2d Cir. 1999). She explains that the documents are titled "Classification Guidance for CIA High Value Detainee Information" and "Classification Guidance for Central Intelligence Agency Rendition, Detention, and Interrogation Program Information" and that they "were developed . . . to provide classification guidance to court security officers and other personnel supporting the military commissions, who are often

asked to advise others or opine on the classification of information related to the CIA's former Rendition, Detention, and Interrogation program." Shiner Decl. ¶ 8.

Shiner then provides three non-conclusory[9] statements that explain with "reasonable specificity," see Halpern, 181 F.3d at 293, that the redacted information relates to intelligence sources and methods. First, Shiner states that "the redacted . . . information primarily relates to aspects of the CIA's Rendition, Detention, and Interrogation ("RDI") program that remain classified." Shiner Decl. ¶ 14. Second, Shiner explains that "the withheld information includes . . . intelligence . . . sources[] and methods relevant to the capture, transfer, and interrogation of detainees." Id. Finally, Shiner states that "if the CIA disclosed particular . . . sources[] or methods, they would become less effective and their continued use by the CIA would be jeopardized." Id. ¶ 15.

I find that Shiner's declaration has provided the minimum required showing. Taken together, Shiner's statements explain that the withheld classified information relates to the capture, transfer, and interrogation of detainees within the CIA's RDI program. It is certainly logical that the details of this program, which involves CIA's capture, transfer, and interrogation of detainees, constitute a classified intelligence "method" — after all, one of the primary purposes of interrogation of detainees is to gather foreign intelligence. Moreover, the "broad sweep" of the term intelligence sources and methods extends to information that must be kept secret in order to "protect[] our intelligence sources and methods from foreign discovery." See Sims, 471 U.S. at 169; Gardels, 689 F.2d at 1105. It is plausible that even "superficially innocuous" information

---

[9] Shiner's declaration also contains a number of conclusory statements that the redacted information relates to intelligence sources and methods, but those statements are accorded no weight. See, e.g., Shiner Decl. ¶ 10 ("The information at issue . . . concerns . . . 'intelligence sources or methods.'"); id. ¶ 17 ("[T]he redacted information concerns intelligence sources or methods.").

relating to the past RDI program must be kept secret in order to preserve the efficacy of the CIA's future intelligence-gathering efforts. See Sims, 471 U.S. at 178. In short, Shiner's explanation provides substance despite its brevity, and resembles other brief statements in declarations that have been upheld by reviewing courts. See, e.g., Pub. Citizen v. Dep't of State, 276 F.3d 634, 644-45 (D.C. Cir. 2002) (approving declaration that stated that "[d]isclosure . . . could enable . . . foreign persons or entities opposed to United States foreign policy objectives to identify U.S. intelligence activities, sources or methods").

Moreover, a finding that the Shiner declaration suffices to uphold the exemption accords with the D.C. Circuit's decision in American Civil Liberties Union v. Department of Defense ("ACLU v. DOD II"), 628 F.3d at 624. In that case, plaintiffs sought information from the CIA relating to Guantanamo detainees. The CIA claimed that certain responsive information was classified and provided a declaration that "described, in general terms . . . , the information withheld from each responsive document," which included "information regarding the capture of detainees [and] the detainees' confinement conditions and locations." Id. at 625. The D.C. Circuit held that the CIA's declaration "explained with sufficient detail why the withheld information qualifies as 'intelligence sources or methods.'" Id. at 626. There, as here, the withheld information relates to the CIA's capture and detention of detainees. As the D.C. Circuit found, it is logical and plausible that information regarding the capture and detention of detainees by the CIA constitutes intelligence sources and methods.

Plaintiff's arguments to the contrary are — with one exception — unpersuasive. First, plaintiff argues that the CIA's declaration merely restates the legal standard. Pl.'s Mem. at 31. Of course, a declaration "that merely recite[s] statutory standards . . . will not . . . carry the government's burden." Larson, 565 F.3d at 864. But as described above, Shiner's declaration

contains specific, non-conclusory statements that do more than restate the statutory standard; they provide a "contextual description . . . of the documents subject to redaction [and] of the specific redactions made." See Halpern, 181 F.3d at 293; cf. Am. Civil Liberties Union v. Office of the Dir. of Nat. Intelligence, No. 10 Civ. 4419, 2011 WL 5563520, at *5 (S.D.N.Y. Nov. 15, 2011) (finding that an agency's declaration was "simply not enough" when it "assert[ed] that 'the information in these documents is protected by the sources and methods provision of the National Security Act,' and recite[d] the language of the statute." (internal alterations and citation omitted)); El Badrawi v. Dep't of Homeland Sec., 583 F. Supp. 2d 285, 314 (D. Conn. 2008) (finding a declaration "merely restate[d] the standards" when it stated that the withheld document "contains information relating to intelligence sources and methods.").

Second, plaintiff argues that the CIA could not be properly redacting classified information relating to the RDI program because a significant amount of information about that program has been declassified. See Pl.'s Mem. at 30-31. The argument is unpersuasive: Shiner specifically states in her declaration that the redactions involve information that "remains classified," Shiner Decl. ¶ 14, a determination that is entitled to "substantial weight," Doherty, 775 F.2d at 52; see also Sims, 471 U.S. at 180 ("[I]t is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors" involved in classification decisions.). Moreover, a similar argument was made and rejected in ACLU v. DOD II. There, plaintiffs argued that the withheld information was not properly classified because the information "ha[d] already been declassified and [was] widely available to the public." 628 F.3d at 620. The D.C. Circuit rejected this argument and deferred to the CIA's assertion that "there are substantive differences between the content of the publically released [information] and the withheld information." Id. at 621. The same conclusion is warranted here: the CIA's assertion that the

withheld information is substantively different than publicly available information is entitled to deference.

Third, plaintiff charges that the CIA has failed to meet its burden because Shiner's declaration provides only one explanation for all of its redactions instead of providing a particularized description for each. Pl.'s Mem. at 28-30. In order to meet its burden, the government must explain how "each of the individual redactions" meets the statutory standard. Halpern, 181 F.3d at 294; King v. U.S. Dep't of Justice, 830 F.2d 210, 224 (D.C. Cir. 1987). But when the showing is "identical for several . . . items redacted, a single representation . . . may suffice." King, 830 F.2d at 224; cf. Larson, 565 F.3d at 868 ("[A] response so vague that it suits every case would fail for any number of reasons — but the fact that similar exemption explanations . . . suit similar cases . . . is not a cause for further judicial inquiry."). Here, four of the challenged redactions fall within a list entitled "Information Relating to the RDI Program that Remains Classified." Doc. 89 at 3-4; Doc. 90 at 5-6, ECF No. 22-9 at 6-7, 12-13. Shiner's declaration, which provides a single explanation relating to the RDI program, suffices for each of these four redactions.

Plaintiff correctly points out, however, that by its terms the fifth challenged redaction does not relate to the RDI program. With respect to this redaction, I agree with plaintiff that Shiner's declaration is insufficient. The general explanation offered by Shiner is that the redacted information "primarily relates" to the RDI program. Shiner Decl. ¶ 14; see also Defs.' Reply at 21 (Shiner's declaration explains that "the redacted information relates to aspects of CIA's RDI program."). But the fifth redaction is part of a list in Document 90 entitled "Other Classified Information Not Relating to the RDI Program." Doc. 90 at 6, ECF No. 22-9 at 16 (emphasis added). Taken together, it appears that "the rationale given for exemption is . . . inconsistent with the

released portions of the document." See Armstrong v. Exec. Office of the President, 97 F.3d 575, 580 (D.C. Cir. 1996). The only part of Shiner's declaration that could be read as justifying this redaction is her statement that the redacted information generally "includes ... intelligence ... sources[] and methods relevant to the capture, transfer, and interrogation of detainees." Shiner Decl. ¶ 14. But "includes" is not specific enough: Shiner states that the withheld information as a whole "includes" information that relates to the capture, transfer, and interrogation of detainees, but she nowhere states that each redaction contains this information. Shiner's declaration thus contains no "particularized description[]" of the content of the fifth redaction that would allow this court to determine that the withheld information constitutes intelligence sources and methods.[10] See Halpern, 181 F.3d at 294.

In conclusion, the CIA has met its initial burden of demonstrating that the first four redactions consist of "intelligence sources and methods," which are exempt from disclosure under FOIA exemption 3 pursuant to the National Security Act. With respect to the fifth challenged redaction, however, which contains information "not relating to the RDI program," Shiner's declaration fails to provide a sufficient explanation.

### iii. Contrary Evidence in the Record

The plaintiff may overcome the CIA's initial showing by demonstrating that "contrary evidence in the record" precludes a grant of summary judgment in the agency's favor. Wilner, 592 F.3d at 73 (quoting Larson, 565 F.3d at 862). A plaintiff has the burden of presenting affirmative evidence, which must be more than a "conclusory accusation." Billington v. Dep't of Justice, 11 F. Supp. 2d 45, 58, 62 (D.D.C. 1998), aff'd in part and rev'd in part, 233 F.3d 581 (D.C. Cir. 2000);

---

[10] For the same reasons, Shiner's declaration is insufficient to demonstrate that the fifth redaction constitutes "intelligence activities," which the CIA argues alternatively justifies its withholding under exemption 1.

see also Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). Plaintiff argues that the CIA's initial showing is controverted by two pieces of evidence in the record.[11] As I explain below, neither controverts the CIA's showing.

First, plaintiff points to a report published by the Senate Select Committee on Intelligence titled "Study of the CIA's Detention and Interrogation Program," part of which has been declassified. See Pl.'s Mem. at 30-31; S. Select Comm. On Intelligence, Comm. Study of the CIA's Detention and Interrogation Program ("SSCI Report"), Decl. of Hannah Bloch-Wehba Ex. J, ECF No. 22-12. Plaintiff explains that "[t]he SSCI Report disclosed specific information regarding CIA's activities and methods, as well as foreign government participation, in the RDI program," Pl.'s Mem. at 31, and suggests that this report serves as evidence that the CIA has improperly classified portions of the documents at issue in this case. But, as explained above, Shiner's declaration specifically states that the withheld information "remains classified" even after the declassification of the SSCI report. Shiner Decl. ¶ 14. The SSCI report is thus not contrary evidence in the record that undermines the CIA's declaration. Rather, the SSCI Report is consistent with Shiner's declaration, which suggests that "there are substantive differences between the content of the publically released [report] and the withheld information." ACLU v. DOD II, 628

---

[11] Plaintiff initially argued that a third piece of evidence in the record also controverted the CIA's showing: a document dated January 28, 2015 titled "Classification Guidance for Information about the Central Intelligence Agency's Former Rendition, Detention, and Interrogation Program," which was produced in response to a different FOIA request and is publicly available on the website www.openthegovernment.org. Decl. of Hannah Bloch-Wehba Ex. F, ECF No. 22-8, available at http://www.openthegovernment.org/sites/default/files/RDIclassificationguidance.pdf. Plaintiff observed that one of the bullet points that appears in full in that document appeared to be identical to a statement that appeared on page 5 of Document 90, except that in the version of Document 90 initially produced by the CIA two phrases were redacted. Plaintiff contended that this discrepancy "refutes the government's assurance that it has 'conducted a page-by-page, line-by-line review" of the withheld records. Pl.'s Mem. at 32. After plaintiff filed his cross-motion for summary judgment, however, the CIA reprocessed plaintiff's FOIA request. In doing so, it unredacted the two phrases on page 5 of Document 90 identified by the plaintiff. Because the unredacted text of these phrases is now available to plaintiff, the 2015 document does not constitute contrary evidence in the record and cannot defeat the CIA's motion for summary judgment.

F.3d at 621. Plaintiff's assertion that the redacted information duplicates information in the SSCI report "does no more than differ from the Agency's informed position which [I] must accept if plausible and reasonable." Gardels, 689 F.2d at 1106.

Second, plaintiff points to certain redactions that were removed during the CIA's reprocessing of his FOIA request as evidence to defeat summary judgment for the agency. After plaintiff filed his cross-motion for summary judgment, the CIA produced reprocessed versions of Documents 89 and 90. See Letter, ECF No. 27; Reprocessed Redacted Copies, ECF No. 27-1, at 4-7 (Doc. 89), 8-13 (Doc. 90). In its reprocessing, the CIA did not remove any of the five redactions challenged by plaintiff. However, the agency did remove or alter six other redactions. Specifically, it removed four redactions involving phrases "foreign liaisons," "foreign liaison services," or "foreign intelligence services"; eliminated a redaction of the phrase "or interrogation"; and moved one redaction to a slightly different location.[12] Plaintiff argues that in making these changes, the CIA "revealed that the government had indeed redacted much information that was not properly classified." Pl.'s Reply at 18-19.

An agency's decision to declassify documents cannot be used to prove that those documents were initially improperly withheld. ACLU v. DOD II, 628 F.3d at 627. This is because an agency should not be "penalize[d] . . . for voluntarily reevaluating and revising its FOIA withholdings." Id. Here, the CIA voluntarily produced redacted information following plaintiff's filing of his cross-motion for summary judgment — including certain redactions that were

---

[12] As to the latter alteration, the version of page 4 of Document 89 initially produced to plaintiff contained the phrase "any foreign [redacted] cooperation," while the reprocessed version says "any [redacted] service cooperation." See ECF No. 22-9 at 7; ECF No. 27-1 at 7. After plaintiff filed his reply brief pointing out the difference, the CIA produced yet another version of this page, which modifies the phrase to read "any foreign [redacted] service cooperation." Second Reprocessed Copy of Page 4 of Document 89, ECF No. 27-2.

specifically questioned in the plaintiff's brief. See Pl.'s Mem. at 32 (questioning propriety of redactions on page 5 of Document 90, which were subsequently removed by the CIA). Plaintiff cannot now seize on this voluntary disclosure.

Moreover, plaintiff's quibbles with the redactions removed and altered by the CIA are minor and unrelated to the substance of this dispute. "[M]inor inconsistencies" in an agency's invocation of FOIA exemptions "are unsurprising and practically inevitable." Clemente v. F.B.I., 741 F. Supp. 2d 64, 88 (D.D.C. 2010). Further, here there is no "logical connection between what [the plaintiff] views as inconsistencies and the overall validity of the . . . [agency's] withholding decisions," because none of the removed or altered redactions are at issue in this case. Schoenman v. F.B.I., 763 F. Supp. 2d 173, 192 (D.D.C. 2011). Plaintiff's assertions about unrelated redactions cannot preclude a grant of summary judgment for the CIA. See Golden Pac. Bancorp. v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986))).

*iv. Summary Judgment Is Granted in Part and Denied in Part for the CIA.*

As explained above, the CIA has met its burden to demonstrate that the first four redactions were properly withheld under exemption 3, and the plaintiff has not controverted the agency's showing. Summary judgment is thus granted to the CIA with respect to those redactions.

The CIA's motion for summary judgment is denied without prejudice to renewal with respect to the fifth redaction: the final bullet point in Document 90 which appears on the list of "Other Classified Information Not Relating to the RDI Program." See Doc. 90 at 6, ECF No. 22-9 at 13. Although the CIA has not made its initial showing that this withholding is proper, it may produce evidence in the future that will suffice. Conversely, although the plaintiff has produced

no evidence demonstrating that the agency's withholding is improper as a matter of law, he may produce such evidence in the future.

## C. CIA's Glomar Response Pursuant to Exemptions 1 and 3

In response to the second and third prongs of plaintiff's FOIA request, the CIA asserted a "Glomar response": a statement to plaintiff that the CIA "can neither confirm nor deny the existence or nonexistence of [responsive] records." Wilson Decl. ¶ 11.

### i. The Glomar Doctrine

Under the Glomar doctrine, an agency may refuse to confirm or deny the existence of responsive records under the "unusual circumstance[]" where disclosing whether responsive documents exist would "cause harm cognizable under a FOIA exception." N.Y. Times, 756 F.3d at 122 (quoting Am. Civil Liberties Union v. C.I.A., 710 F.3d 422, 433 (D.C. Cir. 2013)); Wilner, 592 F.3d at 68 (quoting Gardels, 689 F.2d at 1103). "To properly employ the Glomar response to a FOIA request, an agency must 'tether' its refusal to respond to one of the nine FOIA exemptions – in other words, 'a government agency may refuse to confirm or deny the existence of certain records if the FOIA exemption would itself preclude the acknowledgment of such documents.'" Id. (alterations omitted) (quoting Minier v. C.I.A., 88 F.3d 796, 800 (9th Cir. 1996)).

Courts reviewing a Glomar response "apply the general exemption review standards established in non-Glomar cases." Wolf v. C.I.A., 473 F.3d 370, 374 (D.C. Cir. 2007). Accordingly, "[i]n Glomar cases, courts may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting Gardels, 689 F.2d at 1105). A reviewing court "must 'accord substantial weight to

the agency's affidavit concerning the details of the classified status of the disputed record.'" Wolf, 473 F.3d at 374 (quoting Miller v. Casey, 730 F.2d 773, 776 (D.C. Cir. 1984)).

The CIA asserts that a Glomar response is warranted under both exemption 1 and exemption 3 because "the 'fact of'" the existence or nonexistence of records responsive to parts two and three of plaintiff's FOIA request is classified." Shiner Decl. ¶ 19. The CIA again bases its exemption 1 claim on Executive Order 13526 and its exemption 3 claim on the National Security Act, 50 U.S.C. § 3024, both of which protect intelligence sources and methods from disclosure. See supra Part II.B.i. And the CIA again relies upon the declaration of Antoinette Shiner to support its motion for summary judgment. Id.; see also Shiner Decl. ¶ 24 ("[A] CIA response that confirms or denies the existence or nonexistence of records would reveal sensitive information about the CIA's . . . [intelligence] sources[] and methods that is protected from disclosure."). Thus, the key preliminary question before the court is whether Shiner's declaration demonstrates that "as a whole it appears logical and plausible" that the Glomar response is needed to "protect[] our intelligence sources and methods from foreign discovery." See Gardels, 689 F.2d at 1105; accord N.Y. Times, 756 F.3d at 119. If the answer to this question is yes and the plaintiff can offer no contrary showing, then exemption 3 applies.

*ii. CIA's Glomar Response to the Second Prong of Plaintiff's FOIA Request*

Under the second prong of his FOIA request, plaintiff sought the following records from the CIA:

> (2) Records sufficient to disclose the means by which any original classifying authority can monitor or interrupt the 40-second delayed audio-video transmission of military commission proceedings to prevent the public disclosure of classified information or other information of the kinds covered by Rule 506 of the Military Commission Rules of Evidence

FOIA Requests, Compl. Ex. A, ECF No. 1-8, at 2, 5, 17; see also Wilson Decl. ¶ 5. Shiner's

declaration explains the CIA's position that a Glomar response to this portion of plaintiff's request

is necessary:

> If the CIA were to confirm the existence of records responsive to [the second part
> of plaintiff's FOIA request], such confirmation could indicate, among other things,
> that the CIA has previously interrupted the 40-second delayed audio-video
> transmission of military commission proceedings. An adversary could use that
> information to identify areas of concern to the CIA. On the other hand, if the CIA
> were to respond by admitting that it did not have records responsive to part two of
> the request, it could suggest that the CIA does not have the ability to monitor or
> interrupt the audio-video transmission of proceedings, which could cause
> participants to disregard the rules regarding the communication of CIA-related
> information in open court.

Shiner Decl. ¶ 24.

The question before me is whether Shiner's declaration demonstrates that "as a whole it

appears logical and plausible" that the fact of the existence or non-existence of records responsive

to the second prong of plaintiff's FOIA request must be withheld to "protect[] . . . intelligence

sources and methods from foreign discovery." See Gardels, 689 F.2d at 1105; accord N.Y. Times,

756 F.3d at 119. I find that Shiner's declaration meets the CIA's burden. Her declaration explains

that if the CIA were required to disclose the existence or non-existence of records relating to the

means by which any original classifying authority can monitor or interrupt the Guantanamo audio

feed, such confirmation could indicate that the CIA has previously interrupted the feed or that the

CIA lacks the capacity to do so. Shiner Decl. ¶ 24. This makes logical sense. If the CIA has records

responsive to plaintiff's request, it would be logical to infer that the CIA has some role in the

interruption of the feed, which the CIA asserts is a classified fact — and which certainly constitutes

an intelligence method. See id. This inference is by no means a certainty: as the plaintiff suggests,

an alternative inference could be drawn that the CIA possesses records relating to a different

classification authority's interruption of the feed. See Pl.'s Mem. at 38-39. The Supreme Court has

been clear, however, that an agency may withhold "superficially innocuous information on the ground that it might enable an observer to discover the identity of an intelligence source" by "piecing together bits of other information even when the individual piece is not of obvious importance in itself." Sims, 471 U.S. at 168, 178 (quoting Halperin, 629 F.2d at 150). Further, the Court emphasized that "it is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors" involved in classification decisions. Id. at 180. The CIA's explanation, as articulated in Shiner's declaration, logically and plausibly articulates how the disclosure of the fact of the existence or non-existence of the requested records could reveal a piece of information that, particularly if pieced together with other information, could reveal the CIA's intelligence methods. The CIA has met its burden.

Plaintiff argues that the CIA cannot invoke Glomar here because the information he seeks has been "officially acknowledged," Pl.'s Mem. at 44, but this argument is wholly unsupported. Under the "official acknowledgement doctrine" as applied to Glomar cases, "[a]n agency . . . loses its ability to provide a Glomar response when the existence or nonexistence of the particular records covered by the Glomar response has been officially and publicly disclosed." Wilner, 592 F.3d at 70. Thus, "[i]f the government has admitted that a specific record exists, a government agency may not later refuse to disclose whether that same record exists or not. Id.; accord Wolf, 473 F.3d at 379 (inquiry is whether "the prior disclosure establishe[d] the existence (or not) of records responsive to the FOIA request"). Plaintiff points to no official prior disclosure of the existence or non-existence of the records he seeks here. Thus, the official acknowledgement doctrine does not apply.

Next, the plaintiff makes a related but conceptually distinct argument: that the CIA cannot invoke Glomar because evidence in the record demonstrates that the classified information that the

CIA seeks to protect has been disclosed by government officials. Plaintiff relies upon a recent Second Circuit case, Florez v. C.I.A., which held that public disclosure of relevant records by a different government agency, though not subject to the official acknowledgement doctrine, could constitute "relevant and contradictory record evidence." 829 F.3d at 187. The court explained that such records could "have appreciable probative value in determining . . . 'whether the justifications set forth in the CIA's declaration [in support of its Glomar response] are logical and plausible.'" Id. at 185-86. (quoting Ctr. for Constitutional Rights v. C.I.A., 765 F.3d 161, 168 (2d Cir. 2014)).

Plaintiff puts forth evidence of public disclosure, primarily by the DOD, of relevant documents that he believes undermine the plausibility of Shiner's declaration. Specifically, he argues that this evidence shows that the following four facts have been publicly disclosed by the government: (1) "classification authorities can monitor proceedings"; (2) "the CIA is a classification authority"; (3) "one or more classification authorities had the ability to censor the [audio] feed" at Guantanamo; and (4) "the CIA has . . . an interest in and ability to infiltrate and control audio-visual transmissions remotely." Pl.'s Mem. at 41-44 (citing Decl. of Hannah Bloch-Wehba Exs. A, C, D, G, I, K, ECF Nos. 22-3, 22-5, 22-6, 22-9, 22-11, 22-13). Plaintiff suggests that, when aggregated, these pieces of evidence show that the fact that the CIA is involved in monitoring or interrupting the proceedings at Guantanamo has been publicly disclosed by the government. See Pl.'s Mem. at 41-42. Plaintiff then argues that because the CIA's involvement has been publicly disclosed, it cannot form the basis of the agency's invocation of Glomar. See id.; cf. Shiner Decl. ¶ 24 ("If the CIA were to confirm the existence of records . . . such confirmation could indicate . . . that the CIA has previously interrupted the 40-second delayed audio-video transmission of military commission proceedings."). But even assuming arguendo that plaintiff's evidence in fact demonstrates that each of the four listed facts has been publicly

disclosed, it does not follow that the CIA's involvement in monitoring or interrupting proceedings at Guantanamo has been publicly disclosed. The facts that the plaintiff points to, if true, would indicate only that the CIA is a classification authority that has an interest in monitoring proceedings at Guantanamo — not that the CIA has in fact done so. Florez thus does not support the plaintiff's position here.

Finally, the distinction between official disclosure by the government and "publicly available information" seems to elide the plaintiff. Plaintiff argues that the CIA's showing is inadequate because relevant information is "publicly available." See Pl.'s Mem. at 40, 44. But, "as a general rule, an agency may invoke the Glomar doctrine in response to a FOIA request regarding a publicly revealed matter." Wilner, 592 F.3d at 70; see also Wolf, 473 F.3d at 378; Fitzgibbon v. C.I.A., 911 F.2d 755, 766 (D.C. Cir. 1990) (prior decisions "have unequivocally recognized that the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources [and] methods."). The fact that information is publicly available does not contravene the CIA's showing that it is properly classified.

*iii. CIA's Glomar Response to the Third Prong of Plaintiff's FOIA Request*

Under the third prong of his FOIA request, plaintiff seeks the following records from the CIA:

> (3) Records sufficient to disclose the number of security officers assigned to the military commissions, including security officers detailed to the specific defense teams, together with the duties and authorities of those security officers, the total annual cost of those security officers, and any instructions or training provided to those officers.

FOIA Requests, Compl. Ex. A, ECF No. 1-8, at 2, 5, 17; <u>see also</u> Wilson Decl. ¶ 5. Shiner's declaration explains the CIA's position that a Glomar response to this prong of plaintiff's request is necessary:

> With respect to part three, if the CIA were to confirm the existence of responsive records, such confirmation could reveal the CIA's role, if any, in the assignment of security officers to the military commissions and its relationship to the Office of Military Commissions.

Shiner Decl. ¶ 24.

I find that Shiner's declaration demonstrates that "as a whole it appears logical and plausible" that the fact of the existence or non-existence of records responsive to the third part of plaintiff's FOIA request must be withheld to "protect[] . . . intelligence sources and methods from foreign discovery." <u>See</u> <u>Gardels</u>, 689 F.2d at 1105; <u>accord</u> <u>N.Y. Times</u>, 756 F.3d at 119. Shiner explains that disclosure of the fact that the CIA either has or does not have records relating to security officers at Guantanamo would reveal the relationship that the CIA has with the Office of Military Commissions, if any. Shiner Decl. ¶ 24. This is "logical and plausible." <u>See</u> <u>Gardels</u>, 689 F.2d at 1105. Whether or not records within the CIA exist relating to the military commissions would indeed be likely to suggest the existence and extent of the relationship between the CIA and the Office of Military Commissions.

Shiner then states that the relationship that CIA has with the Office of Military Commissions, if any, is an intelligence source or method that is properly classified. This classification determination is entitled to substantial weight. <u>Wilner</u>, 592 F.3d at 68. Here, Shiner's explanation is logical and plausible, so the CIA has met its burden. The CIA's involvement, if any, at the military commissions at Guantanamo is logically related to its intelligence-gathering purpose. Detainees at Guantanamo are potential intelligence sources. <u>See, e.g.</u>, <u>ACLU v. DOD II</u>, 628 F.3d at 625 ("[T]he CIA's ability to interrogate detainees . . . pertain[s] to the CIA's core

mission of collecting and analyzing intelligence."). To the extent that the CIA participates in the military commissions, it would be logical that such participation is a method of gathering intelligence.

Plaintiff's primary argument to the contrary is unpersuasive. Plaintiff asserts that any role played by the CIA in the military commissions at Guantanamo exceeds the agency's statutory authority because the CIA's authorizing statute does not permit it to exercise law enforcement power. See Pl.'s Mem. at 45 (citing Weissman v. C.I.A., 565 F.2d 692, 695 (D.C. Cir. 1977)). Plaintiff then argues that the CIA cannot exercise its classification authority over activities that exceed its statutory authority. See id. at 44 ("To the extent that CIA's involvement in the military commissions exceeds its role as a classification authority, its activities and relationships are not . . . 'intelligence sources or methods.'" (alterations omitted)). However, "there is no legal support for the conclusion that illegal activities cannot produce classified documents." ACLU v. DOD II, 628 F.3d at 622. Thus, even if the CIA has exceeded its authority by involving itself in law enforcement proceedings at Guantanamo, it may properly classify documents based on this involvement.

Plaintiff also summarily asserts that evidence in the record — specifically, Documents 89 and 90, which were produced by the CIA in response to plaintiff's FOIA request and are described in detail in Part II.B, supra — controverts the CIA's showing. Plaintiff explains that these documents "establish that the agency regulates the disclosure of CIA-related information at the [military] commissions." Pl.'s Reply at 24. This argument is unpersuasive. The fact that the CIA has released documents that purport to advise military commissions personnel on the classification of information does not controvert Shiner's more general statement that the fact of CIA involvement in the military commissions, if any, is classified.

*iv. Summary Judgment is Granted for the CIA*

The CIA has properly invoked the Glomar doctrine, "tether[ed]" to FOIA exemption 3, in response to the second and third prongs of plaintiff's FOIA request and is thus entitled to summary judgment. See Wilner, 592 F.3d at 68. "Because defendants need only proffer one legitimate basis for invoking the Glomar response and FOIA Exemptions 1 and 3 are separate and independent grounds in support of a Glomar response," I decline to decide whether the CIA has also met the additional requirements of exemption 1. Id. at 72.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted in part and denied in part. Specifically, each parties' motions are resolved as follows:

- Plaintiff: Plaintiff's motion for summary judgment is denied in its entirety.

- ODNI: ODNI's motion for summary judgment as to the adequacy of its search is denied.

- DOD: DOD's motion for summary judgment as to the adequacy of its search is denied. DOD's motion for summary judgment as to its withholding of portions of the powerpoint presentation of the 2014 annual security refresher training for the Washington Headquarter Services, Office of Special Security is likewise denied.

- CIA: CIA's motion for summary as to the adequacy of its search is denied. CIA's motion for summary judgment as to the adequacy of withholdings in Documents 89 and 90 is granted in part and denied in part. Specifically, the CIA's motion is granted with respect to the first four challenged redactions under exemption 3. It is denied with respect to the fifth redaction: the final bullet point in Document 90 which appears on the list of "Other Classified Information Not Relating to the RDI Program." See Doc. 90 at 6, ECF No. 22-9 at 13. CIA's motion for summary judgment as to its Glomar response to the second and third prongs of plaintiff's request is granted.

To the extent each motion is denied, it is denied without prejudice to renewal.

        SO ORDERED.

                                                /s/(ARR)
                                                _____
Dated:        January __, 2017                  Allyne R. Ross
              Brooklyn, New York                United States District Judge